UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RELIQ HEALTH TECHNOLOGIES, INC. § <br>    Plaintiff, § <br> § <br> v. § <br> § <br> SHELBY NEAL, AND § <br> ACCUHEALTH TECHNOLOGIES, LLC § <br>    Defendants. | | CIVIL ACTION NO. 4:19-cv-00040 |

STATE OF _____ §
§     **DECLARATION OF STEPHEN SAMSON**
COUNTY OF _____ §

1. "My name is Stephen Samson, I am over the age of 18 and am of sound mind. I have never been convicted of a felony or a crime involving moral turpitude and am otherwise competent to make this declaration. Unless otherwise stated, I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto. I understand that this declaration will be used in support of a motion filed by Accuhealth Technologies, LLC, myself, and Boby Deveros in connection with the above cause.

2. I am the Chief Executive Officer ("CEO") of Accuhealth Technologies, LLC, and I formerly was the Chief Information Officer ("CIO") at Reliq Health Technologies, Inc., and it is in those capacities that I have personal knowledge of the matters described below.

3. I have extensive background as a cyber security consultant. I was recruited to be Reliq's CIO in January 2018. I managed Reliq's development team, sales team, and implementations team, the latter of which later included Boby Deveros ("Deveros"), who was retained as an independent contractor in May 2018 to fulfil the role of Director of Implementations.

4. We were lured to Reliq, separately, based on false information provided by Reliq's management team about the nature of Reliq's business and its financial performance. I was recruited

EXHIBIT A

by Giancarlo De Lio ("De Lio"), who was Reliq's Chief Visionary Officer.

5. I discovered on or about April 13, 2018 what I believed to be material misrepresentations made by Reliq regarding the number of patient subscribers it had at that time, and I went straight to management with my concerns.

6. De Lio, assured me that the patients I said were not on the Reliq system were, in fact, "there." They just were not reflected within the Reliq system, yet. De Lio explained that the vast majority of the patients were from Paz Home Health, LLC (Paz), a home health care agency based in McAllen, and that Paz simply had trouble onboarding its patients onto the Reliq system.

7. I believed his explanation regarding the falsified patient numbers at that time, but I continued to insist over the ensuing weeks that Reliq formally correct its misstatements and tell the public that it did not yet have thousands of subscribers, and that in fact had less than 250.

8. To help onboard new patients, I purchased a home health agency in Texas in August 2018, which required obtaining a 'Home and Community Support Services Agency License' from a pre-existing licensee known as ASC Healthcare, Inc. Later, that name was changed to Accuhealth Technologies, Inc. The Accuhealth business was started with the full knowledge and support of Reliq. In fact, I asked Reliq for permission to purchase a home health agency.

9. Accuhealth was set up to onboard home health patients for whom telemontoring would be beneficial. Accuhealth also was to be an "incubator" that would utilize Reliq's software and help Reliq debug and work through various software issues and onboarding issues which were occurring for all of Reliq's customers at that time. This was a necessary step for Reliq, as it had until that time been unable to successfully roll out any operable version of its telemonitoring software.

10. However, I did not understand how totally useless Reliq's internally developed iUGO software was until Accuhealth became a Reliq customer and I tried to use the software on a daily basis.

11. Deveros and I, through Accuhealth, worked with Reliq's internally developed iUGO software to try to debug it and make it a useable product. We were not successful. However, I believed that if Reliq deployed software that actually worked for

its intended purpose, Reliq could be a successful company. I then suggested to Reliq's management that Reliq go outside the company to a third party developer to acquire a useable software product and then "white label" it for use by Reliq.

12. Deveros and I—outside Reliq and over a relatively short period of time—developed a software product that we believed would work far better for Reliq than Reliq's internally produced software, which we knew first hand would not work at all.

13. I think in early October 2018, Deveros and I believed software that we developed and owned through a company called Evelyn Technologies, LLC would work well for Reliq. Yet, we remained troubled that CEO Lisa Crossley ("CEO Crossley") and Reliq still had not come clean and corrected the many material misstatements Reliq made concerning the company's financial results and its subscriber/patient numbers. I still believed in the Reliq concept, but I did not trust Reliq management.

14. CEO Crossley added to my mistrust when she informed me that Reliq's Board Chairman was not yet aware of the misstated financials, and that I should keep quiet and should not disclose the information to the Chairman.

15. I was fed up with the lies, so I presented Reliq with a detailed plan to turn around and transform Reliq into a company that was viable and transparent. Part of the plan included Reliq acknowledging publicly that the subscriber numbers it had claimed to that date were inaccurate. The plan also included Reliq licensing software from a third party, whitelabeling the software, and replacing all prior versions of Reliq's iUGO software. The software that Reliq ultimately white labeled it purchased from Evelyn. I did not disclose to Reliq that Deveros and I actually had developed useable software nor our ownership interest in Evelyn.

16. I made clear to CEO Crossley that I would be forced to resign from Reliq if Reliq did not correct its many lies and implement a plan for transparency. CEO Crossley initially was enthusiastic and agreed to the plan and began to implement some aspects of the plan. One part of the plan included hiring a public relations firm to correct Reliq's inaccurate statements to the public, and to put those statements in the best context possible. Reliq hired the public relations firm, Sophic Capital, but then failed to fully disclose company information to Sophic, which thwarted Sophic in doing the job it was hired to do.

3

17. I was instructed to provide "full access" to Sophic, and did just that. Shortly after being given access to the information by Reliq, Sophic resigned from its work for Reliq. Sophic did not disclose publicly the reason for its departure.

18. It quickly became clear to me that CEO Crossley and Reliq were not going to restate Reliq's financials and come clean to the public and their investors.

19. Upon Reliq's failure to comply with the agreed plan for transparency, the me and several other Reliq employees or contractors resigned from Reliq on December 4, 2018. Deveros and I met personally with CEO Crossley when we resigned. We informed CEO Crossley at that meeting of our intent to file complaints with the Securities Exchange Commission ("SEC") and the Ontario Securities Commission ("OSC") in regards to Reliq's repeated and material misrepresentations of patient numbers, paid subscribers, income, potential for income growth, and more. In response to our statements that we were going to report Reliq to the SEC and OSC, CEO Crossley told us that Reliq was going to sue us. This was consistent with her prior veiled threats to us that anyone who messes with Reliq will have to deal with its lawyers, and it has very good lawyers. Exactly one month later, Reliq retaliated against me, Deveros, Accuhealth, and Shelby Neal by filing this lawsuit, among other things.

20. Reliq never had 2,000 patients on its platform, and never had the ability to add 2,000 patients per month.

21. Paz was Reliq's biggest customer or the one which supposedly onboarded the most patients onto the Reliq platform. The truth is that at Paz's very peak, it had approximately 211 patients subscribed to telemonitoring and could onboard only a mere ten patients per month.

22. In reality, I never saw a single, paid subscriber on Reliq's platform. Reliq had no actual subscriber revenue in December 2017, despite its statements that it received $300,000 in recurring monthly revenues.

23. Validic is a third party through which patient data was transmitted to Reliq. Reliq could not receive and interpret that data without the data first going through Validic. Reliq had a contract with Valdic. That contract allowed for a *maximum* of 2,000 patients, which CEO Crossley knew when she was announcing the 6,000, 10,000, and 12,000 patient thresholds.

4

24. 12,000 subscribers announced in March 2018 implied (a) that Reliq had doubled its subscriber base since December 2017 and (b) that Reliq had doubled (to $600,000) its monthly recurring revenue.

25. Reliq claims that its failure to collect revenue was due to client reimbursement issues from payors. In truth, the vast majority of Reliq's failure to collect revenue invoiced to clients was because the clients never had the volume of patients necessary to generate the revenue that Reliq was reporting from those clients. That is, the problem was not that the clients had trouble receiving reimbursement for 12,000 (or 6,000 or 10,000 or 17,000 or 22,000) alleged subscribers; rather, the problem was there never were 12,000 subscribers (or even 1,000). And CEO Crossley knew this fact the entire time she publicly was representing to the contrary.

26. Reliq further reported in other press releases and quarterly calls that its patient onboarding rate had reached a minimum of 2,000 patients per month. This was false, as Reliq's total patient census never reached 2,000 patients, much less 2,000 patients in one month.

27. The price Reliq was going to charge users of its software was $50 per user per month. Accuhealth does not charge for its software.

28. Accuhealth has a Software Agreement with Reliq. Accuhealth has at all times complied with the agreement; however, Reliq has breached the Software Agreement.

29. I never accessed CEO Crossley's e-mail account or her computer. Any access of Reliq employees' email accounts by me was done pursuant to and within the scope of my authority as Chief Information Officer. It also was impossible for the access to have been done in secret.

30. My general duties as CIO included overseeing Reliq's computer system and related technology, along with overseeing Reliq's data center, network security, and e-mail servers. Upon termination of certain Reliq employees, I, as CIO, was tasked with denying the former employee access to Reliq's servers and e-mail accounts, and with examining the former employee's company e-mails for activity that was either suspicious or exposed the company to a security breach. For example, when Reliq terminated its Chief Visionary Officer, Giancarlo De Lio, I personally changed De Lio's password to ensure he would no longer be capable of accessing company emails and information.

5

Prior to changing De Lio's password, I did not access De Lio's email account. Only after changing the password did I gain access to De Lio's emails. Thus, contrary to Plaintiff's allegations, I did not "secretly" monitor and access employee emails, including CEO Crossley's e-mails. CEO Crossley, or any other employee, would have known immediately if their accounts were being accessed by me because their passwords would have been changed and they would have experienced an interruption in service.

31. Attached to the Motion to Dismiss as Exhibits C, H, J, M, and KK are true and correct copies of text messages I either sent or received from Reliq employees. Exhibits K and L are true and correct copies of statements made by Reliq employees, which are contained on transcripts of recorded meetings. Exhibits D and E are true and correct copies of text messages sent to me by Giancarlo De Lio, the Chief Visionary Officer for Reliq. Exhibits F and G are true and correct copies of agreements between Reliq and Accuhealth, and between Reliq, me and Boby Deveros. Exhibits N and R are true and correct copies of a written plan I prepared for Reliq, as well as the resignation letter I wrote to Reliq. Exhibits R, S, T, U, V, W, CC, and FF are true and correct copies of Reliq press releases. Exhibit EE is a true and correct copy of Reliq's financials for the quarter ending March 31, 2018. Exhibit HH is a true and correct copy of Reliq's audited financials for the year ending June 30, 2018. Exhibits AA and GG are true and correct copies of invoices sent to Reliq by Validic and Paz, respectively. Exhibits X and Y are true and correct copies of certain financial documents prepared by Paz and which I obtained from Paz.

I do declare under penalty of perjury that the foregoing is true and correct.

Executed on: \_\_\_\_20 February\_\_\_\_, 2019.

_____
Stephen Samson

## JURAT

My name is Stephen Samson, my date of birth is \_\_13 March 1980\_\_, and my address is \_\_544 Pinellas Bayway South, St. Petersburg Fl. 33715\_\_. I declare under penalty of perjury that the foregoing is true and correct.

6

   Executed in   Lake Charles  ,   Louisiana   on the  20  day of February, 2019.

                 _____
                 Stephen Samson