UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RELIQ HEALTH TECHNOLOGIES, INC. | § § | |
|    Plaintiff, | § § | |
| v. | § § | |
| | § | CIVIL ACTION NO. 4:19-cv-00040 |
| SHELBY NEAL, AND ACCUHEALTH TECHNOLOGIES, LLC | § § § | |
|    Defendants. | | |

| | | |
|---|---|---|
| STATE OF _____ | § | |
| | § | **DECLARATION OF BOBY DEVEROS** |
| COUNTY OF _____ | § | |

1. "My name is Boby Deveros, I am over the age of 18 and am of sound mind. I have never been convicted of a felony or a crime involving moral turpitude and am otherwise competent to make this declaration. Unless otherwise stated, I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto.  I understand that this declaration will be used in support of a motion filed by Accuhealth Technologies, LLC, myself, and Stephen Samson in connection with the above cause.

2. I am the Chief Operations Officer ("COO") of Accuhealth Technologies, LLC, and I formerly was a contractor for Reliq Health Technologies, Inc. It is in those capacities that I have personal knowledge of the matters described below.

3. I was lured to Reliq based on false information provided by Reliq's management team about the nature of Reliq's business and its financial performance.  Giancarlo De Lio ("De Lio"), who was Reliq's Chief Visionary Officer, was the source of the information.

4. Deveros formally joined Accuhealth on September 1, 2018.  The Accuhealth business was started with the full knowledge and support of Reliq.

5. I did not understand how totally useless Reliq's internally

developed iUGO software was until Accuhealth became a Reliq customer and we tried to use the software on a daily basis.

6. Samson and I, through Accuhealth, worked with Reliq's internally developed iUGO software to try to debug it and make it a useable product. We were not successful. I believed that if Reliq deployed software that actually worked for its intended purpose, Reliq could be a successful company.

7. Samson and I—outside Reliq and over a relatively short period of time—developed a software product that we believed would work far better for Reliq than Reliq's internally produced software, which I knew first hand would not work at all.

8. In I think early October 2018, Samson and I believed the software that we had developed and which owned through a company called Evelyn Technologies, LLC would work well for Reliq. Yet, we were troubled that CEO Crossley and Reliq still had not come clean and corrected the many material misstatements Reliq made concerning the company's financial results and its subscriber/patient numbers. I still believed in the Reliq concept, but I did not trust Reliq management.

9. It quickly became clear to me that CEO Crossley and Reliq were not going to restate Reliq's financials and come clean to the public and their investors.

10. Upon Reliq's failure to comply with the agreed plan for transparency, me and several other Reliq employees or contractors resigned from Reliq on December 4, 2018 because of Reliq's deceitful behavior.

11. Samson and I met personally with CEO Crossley when we resigned. We informed CEO Crossley at that meeting of our intent to file complaints with the Securities Exchange Commission ("SEC") and the Ontario Securities Commission ("OSC") in regards to Reliq's repeated and material misrepresentations of patient numbers, paid subscribers, income, potential for income growth, and more. In response to our statements that we were going to report Reliq to the SEC and OSC, CEO Crossley told us that Reliq was going to sue us. This was consistent with her prior veiled threats to us that anyone who messes with Reliq will have to deal with its lawyers, and it has very good lawyers. Exactly one month later, Reliq retaliated against Accuhealth, me, Samson and Shelby Neal by filing this lawsuit, among other things.

12. At no time did Reliq have 2,000 patients on its platform, much

      less the ability to add 2,000 patients per month.

13. In fact, at Paz's very peak, it had approximately 211 patients subscribed to telemonitoring and could onboard only a mere ten patients per month.

14. B Golden actually was not even an operating home health agency, but it is owned by Joseph Estapa who is, by no coincidence, husband to the owner and CFO of Paz Home Health, Dayana Bermea (aka Dayana Zeldis). Its office location is a residential home located in McAllen, Texas. At the time of Reliq's press release regarding B Golden, the truth was that B Golden had zero patients and certainly had no patients subscribed to Reliq's software, which remained true through the date we resigned from Reliq.

15. Reliq issued multiple press releases that grossly misrepresented its number of subscribers. The number of subscribers is directly related to expected revenue and income of the company. The more paid subscribers, the more revenue and income for Reliq. During the time of Reliq's repeated and material misrepresentation of these numbers, Reliq's share price increased rapidly from $.29 on October 1, 2017 to a peak of $1.92 on March 1, 2018.

16. When CEO Crossley was asked on a quarterly investor call that occurred on May 31, 2018 whether all of the reported receivable that had been collected after the close of the quarter was collected from Paz in Texas, CEO Crossley responded, "Yes, all from Paz."

17. Reliq set off $592,263.00 of Paz's booked receivable against a Paz invoice allegedly for business development and clinical input consulting. Reliq thereafter claimed that it had "collected" $592,263.00 in accounts receivable. This was done in an effort to trick the market and its investors.

18. The vast majority of Reliq's failure to collect revenue invoiced to clients was because the clients never had the volume of patients necessary to generate the revenue that Reliq was reporting from those clients. That is, the problem was not that the clients had trouble receiving reimbursement for 12,000 (or 6,000 or 10,000 or 17,000 or 22,000) alleged subscribers; rather, the problem was there never were 12,000 subscribers (or even 1,000). And CEO Crossley knew this fact the entire time she publicly was representing to the contrary.

19. In other press releases and quarterly calls, Reliq reported that

3

its patient onboarding rate had reached a minimum of 2,000 patients per month. This was false, as Reliq's total patient census never reached 2,000 patients, much less 2,000 patients in one month.

20. Sometime in late 2018, upon growing tensions between Reliq and Accuhealth, Accuhealth acted on its suspicions that it was being purposefully ignored, by sending e-mails to support@reliqhealth to test its theories; no one in support responded.

21. I was very much involved in the process of acquiring a new storage and fulfillment location for the device that Reliq supplied its customers. In fact, I played an essential role in the fulfillment process throughout Reliq's relationship with Nexlink, including developing and refining a Statement of Work for Reliq's fulfillment centers.

22. I personally vetted CTC Distributing in Edinburg, Texas as a storage and fulfillment center for Reliq. I did this as part of my job, and with the full knowledge of Reliq's management, including the CFO. I prepared a Statement of Work for CTC, and helped train CTC on fulfilling Reliq's orders. I was never told not to have devices shipped to and stored at CTC until after the initial 5,000 devices and 10,000 sets of diabetic consumables were delivered to CTC.

23. The task was necessary because Nexlink had informed me and Reliq that it would not accept any additional devices. Thus, Reliq needed an alternate site to land the devices that were being shipped from Taiwan.

24. I did not steal any ForaCare medical devices from Reliq. Accuhealth needed the ForaCare devices to fill customer orders, and Reliq was contractually obligated to supply those devices to Accuhealth without charging for the devices. Accuhealth required ForaCare medical devices in order to onboard its new patients.

25. Neither I nor Accuhealth have converted any of Reliq's personal property. When Reliq closed its office in McAllen, it had no plan for what to do with the personal property in the office. It left the storage of the personal property for me to figure out. The property we hold consists of an office table, office chairs, two desks, a Jabra speaker, and a mini-fridge. All of those items are available for Reliq to pick up at any time during business hours. We have never refused to allow Reliq to pick up its property.

4

26. Attached to the motion as Exhibit MM is a true and correct copies of e-mails concerning Nexlink and for which I either was the sender or the receiver.

I do declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>February 20</u>, 2019.

_____
Boby Deveros

## JURAT

My name is Boby Deveros, my date of birth is <u>September 5, 1982</u>, and my address is <u>2310-290 Adelaide St West, Toronto, ON, Canada, M5V0P3</u>. I declare under penalty of perjury that the foregoing is true and correct.

Executed in <u>Lake Charles</u>, <u>Louisiana</u> on the <u>20th</u> day of February, 2019.

_____
Boby Deveros

5

# Signatures

Date: Feb 20 2019

Signature: *[signed]*

Boby Deveros