UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RELIQ HEALTH TECHNOLOGIES, INC. | § | |
|     Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:19-cv-00040 |
| SHELBY NEAL, ACCUHEALTH | § | |
| TECHNOLOGIES, LLC, STEPHEN | § | |
| SAMSON and BOBY DEVEROS, | § | |
|     Defendants. | § | |

**PLAINTIFF'S MOTION FOR EXPEDITED DISCOVERY**

COMES NOW, Plaintiff Reliq Health Technologies, Inc. ("Plaintiff" or "Reliq") and files this Motion for Expedited Discovery from Defendants Stephen Samson ("Samson"), Boby Deveros ("Deveros"), Shelby Neal ("Neal"), and AccuHealth Technologies, LLC ("AccuHealth") (collectively, "Defendants").

### INTRODUCTION

1.  Plaintiff's investigation has revealed that, among their many acts of fraud, Defendants likely copied the source code of iUGO, Reliq's software platform for chronic disease management and remote patient monitoring, to create a copycat competing product for a company they secretly founded called "Evelyn." Defendants surreptitiously convinced Plaintiff to funnel hundreds of thousands of dollars to Evelyn while shutting down Plaintiff's own software production. Defendants then marketed their product under the name for Reliq's software, "iUGO v.3."

2.  Executing their fraud, Defendants downloaded Plaintiff's proprietary information *en masse*, including email communications of other Reliq employees; abruptly resigned without notice to work for a company owned by Samson; refused to turn in their credentials; ignored

1

Plaintiff's Motion for Expedited Discovery

demands to return company property unaltered; and ultimately wiped the computer hard drives on Reliq's computers, as well all Chromebooks belonging to Reliq - despite *express* warnings from counsel that a lawsuit was coming and those hard drives had to be preserved.

3. Even at this early stage in the litigation, the forensic proof establishes that Defendants engaged in willful, systematic, theft of and intentional destruction of evidence, proving their culpability.

4. In yet another act of hubris, and despite their own destruction of evidence, Defendants filed a motion to dismiss Reliq's causes of action under the Texas Citizens Participation Act ("TCPA"), claiming that Reliq had insufficient evidence to prove its allegations against the Defendants.

5. Reliq files this Motion for Expedited Discovery and seeks: (1) depositions of each Defendant;[1] (2) a comparison of all versions of Defendants' source code (which Defendants have been marketing as "iUGO v3") with Plaintiff Reliq's iUGO's source code; and (3) immediate production of all communications between Defendants while they were working for Reliq, and through the date the lawsuit was filed.

### SUMMARY OF ARGUMENT

6. The need for discovery on an expedited basis is based on the Defendants' own actions in destroying and stealing evidence, stealing trade secrets, and then attempting to use those trade secrets for their own commercial benefit. The immediate discovery of remaining evidence and documents is critical for this case. Defendants' extraordinary actions warrant the discovery necessary to support Reliq's request for the issuance of a preliminary injunction. Moreover, this

---

[1] Reliq is agreeable to setting reasonable time limits on the depositions. Reliq previously suggested depositions limited to two-hours each, and limited to the issues raised in Defendants' TCPA Motions to Dismiss. Defendants refused such limited discovery.

discovery is required due to the Defendants' election to file state-law Motions to Dismiss in this court.[2]

7. Even if the TCPA were applicable to this Federal court case – and it is not -- Reliq is entitled to discovery to obtain additional clear and specific evidence in support of each of its claims.

8. Reliq also requests entry of a Scheduling Order, permitting a supplemental response to be filed to Defendants' TCPA Motions to Dismiss after necessary discovery. Reliq seeks this relief without waiving its argument that the TCPA does not apply in this Court or to the claims in this case.

**FACTUAL BACKGROUND**

9. The key facts are set forth in Plaintiff's First Amended Complaint (Dkt. No. 6) and Plaintiff's Consolidated Response to Defendants' Motions to Dismiss under the TCPA. In order to ensure a complete record for this Motion, those documents are incorporated by reference. In general, however, the following facts establish the need for discovery on an expedited basis:

**I. Defendants engage in criminal theft and misrepresentations.**

10. Defendants occupied positions of trust and power in Reliq's organization. Samson served as the Chief Information Officer. *See* <u>Exhibit A</u>, Declaration of Lisa Crossley, CEO of Reliq, attached hereto and incorporated herein by reference, ¶7. Defendants Deveros and Neal also had fiduciary responsibilities related to the implementation of Reliq's proprietary iUGO

---

[2] Plaintiff vigorously contests that the TCPA applies in this federal court case, and is filing a Consolidated Response to Defendants' TCPA Motions to Dismiss. The relief sought in this Motion for Expedited Discovery, however, is still necessary, even if the Court agrees that the TCPA does not apply to Plaintiff's claims. Defendant's spoliation of documents, and active use of misappropriated trade secrets, as well as copyright and trademark infringement, warrant the expedited discovery.

platform. *See* Exhibit A, Declaration of Lisa Crossley. During the year they were fiduciaries to Reliq, Defendants worked to enrich themselves at the expense of Reliq.

11. In the fall of 2018, Samson convinced Reliq that its own iUGO software did not work. Reliq's iUGO software had been developed, over years, for a company called CareKit that Reliq acquired. *See* Exhibit A, Crossley Declaration, ¶6. At Reliq's request, Cecropia Solutions later updated and enhanced the software with additional features. *See* Exhibit D, Declaration of Mitch Landry, attached to Reliq's Consolidated Response. Claiming that the iUGO software now was useless, however, Samson proposed that Reliq adopt a software product owned by a company called "Evelyn." *See* Exhibit A, ¶9. On multiple occasions, in response to direct questions from Reliq's CEO, Samson steadfastly maintained that he had no ownership interest in Evelyn. *Id.*, ¶¶10-12. Defendants now admit that representation was false.

12. Based on Samson's representations about iUGO being unworkable and Evelyn's excellent capabilities, and his statements that he had no financial interest in Evelyn, Reliq undertook to deploy Evelyn's software. *Id.*, ¶¶10, 11, 12. However, when Evelyn failed to meet Reliq's requirements (something as basic as being able to demonstrate functions and features to Reliq staff or customers), Reliq did not deploy the Evelyn software and began searching for alternatives. *Id.*, ¶¶13, 14.

13. Samson became agitated about Reliq's decision to look for alternatives to Evelyn. Reliq began to suspect Samson had not been forthright regarding his relationship with Evelyn. Reliq soon uncovered that Samson (a Canadian citizen) had secretly founded a company in Canada under the name "Evelyn Technologies Canada, Inc." *Id.,* ¶23-24. At this point, Reliq was communicating with its attorneys, and prepared to fire Samson. *Id.*

4

14. Defendants anticipated Reliq's plan to fire Samson because, as forensics investigators later would discover, Samson had been secretly monitoring the email account of Reliq's CEO, Lisa Crossley. Samson, the Chief Information Officer for Reliq, accessed Reliq's CEO's email. Samson searched the email logs of Reliq's CEO on at least the following dates: October 31; November 1, 26, and 30, 2018. *See* <u>Exhibit B</u>, Rotilie Declaration on behalf of Digital Forensics, attached hereto and incorporated by reference.

15. Both before and after their resignations on December 4, 2018, Defendants downloaded Reliq's company files and data; as they prepared to resign, <u>Defendants (including Samson) began downloading confidential files from Reliq's G-Suite server *en masse*. *Id.*</u>, ¶¶11, 16. *See* <u>Exhibit B</u>.

16. <u>On December 3, 2018, the day before his resignation, Samson visited the Google Help topic "Wipe Chrome device data – Google Chrome Enterprise."</u> When Reliq's Chromebooks were returned by Neal, Damaso and Deveros later that week, they had been wiped of all data.

17. On December 4, 2018, Defendants resigned from Reliq and announced they had plans to join a competing company, Defendant AccuHealth. *See* <u>Exhibit A,</u> Crossley Declaration, ¶38. Unbeknownst to Reliq, Defendants continued to login to access Reliq's servers and download files - both the same day they resigned and in the days that followed. *See* <u>Exhibit B</u>, Rotilie Declaration, ¶¶8, 10, 12, 13.

**II. Following their resignation, Defendants ignore demand letters from Reliq's counsel to preserve the company's data, laptops, and proprietary information.**

18. Reliq reacted quickly to Defendants' resignation. Its counsel sent detailed demand letters to Defendants Samson (on December 5) and Deveros (on December 6), demanding the return of their company computers, credentials, and files without destroying any information. *See, e.g.*, <u>Exhibit C</u> (Dentons' law firm correspondence to Samson); <u>Exhibit D</u> (Dentons; law firm

5

Plaintiff's Motion for Expedited Discovery

correspondence to Deveros). Reliq's letter to Samson expressly stated that Reliq intended to initiate a lawsuit. Exhibit C. Reliq's counsel also sent the preservation letters to counsel for Samson.

19. Having stolen Reliq's data, Defendants began efforts to cover their tracks. On December 8, 2018, three days after Reliq's "preservation of evidence" letters, Samson performed a "factory reset" on his company computer. Exhibit B, Rotilie Declaration, ¶7. Starting at 8:48 p.m. on December 8, 2018, Samson worked late into the night to destroy all data, finishing at 2:45 in the morning on December 9, 2019. *See* Exhibit B, Rotilie Declaration, ¶7. A security expert like Samson would know that reinstalling software after a reset "make[s] it impossible to recover any of the data that was originally on the laptop." *Id.*; Exhibit A, Crossley Declaration, ¶6.

**III.     Defendants' lies unravel, and every indication points to software theft.**

20. With one crack in Defendants' scheme exposed, Reliq began to investigate the extent of Defendants' fraud. Reliq contacted its software developer, Cecropia Solutions, who revealed that Samson had secretly instructed the company to cease developing a new key feature of the iUGO software on June 8, 2018, and stop all work abruptly on the iUGO software on October 14, 2018. *See* Exhibit D, ¶¶6, 8, which is attached to Reliq's Consolidated Response.

21. Reliq has confirmed with independent analysis that – contrary to Samson's representations – Reliq's iUGO software was functional, scalable; and perfectly able to accomplish Reliq's objectives. Reliq retained Robert Prouse, a highly accomplished software developer with more than two decades of experience, to evaluate the iUGO software and assess Samson's prior claims that the iUGO software was unusable and could not work. *See* Prouse Declaration, Exhibit E, attached hereto and incorporate herein. Prouse readily concluded that, contrary to what Samson had told Reliq, the iUGO platform was professionally developed, had strong software architecture, could scale, and had the full operational capabilities needed to function as intended. *Id.*, ¶¶6–12.

6

22. After joining Reliq's competitor, Defendants released software that they had supposedly developed in less than two months, all while working full time jobs for Reliq. *See* Dkt. 9-1, ¶12-13; Exhibit A, Crossley Declaration ¶48. Defendants began marketing under the name "iUGO version 3." Exhibit A, ¶44-45. At least one frustrated customer contacted Reliq about its confusion. *Id.* The probable explanation for how Defendants developed sophisticated code from scratch, in a two month period, after having access to—and stealing—Reliq's proprietary information, is that they simply misappropriated the code for themselves. *See* Exhibit E, Prouse Declaration.

## ARGUMENT

23. Because Defendants actions threaten irreparable harm to Reliq, Reliq requests immediate, expedited discovery to determine the scope of the threatened and ongoing misappropriation of its intellectual property. "Federal Rules 34(b) and 26(d) allow a party to seek expedited discovery, and the Fifth Circuit has permitted such discovery in certain circumstances." *Stockade Companies, LLC v. Kelly Rest. Group, LLC*, 1:17-CV-143-RP, 2017 WL 2635285, at *2 (W.D. Tex. June 19, 2017) (citing multiple Fifth Circuit cases).

24. Expedited discovery is warranted upon a showing of "good cause," which typically involves consideration of "'(1) whether a preliminary injunction is pending; (2) the breadth of the discovery requests; (3) the purpose for requesting the expedited discovery; (4) the burden on the defendants to comply with the requests; and (5) how far in advance of the typical discovery process the request was made.'" *Id.*; *see also ELargo Holdings, LLC v. Doe-68.105.146.38*, 318 F.R.D. 58, 61 (M.D. La. 2016) ("'[G]ood cause typically exists where 'the need for expedited discovery outweighs the prejudice to the responding party.'").

**I.   Defendants' conscious decision to wipe hard drives and engage in mass deletion of data warrants expedited discovery.**

24.   Each of the relevant factors weighs in favor of permitting expedited discovery. *First,* although Defendant's purposeful destruction of evidence speaks for itself, the sought-after discovery will assist the Court in determining whether Defendants stole trade secrets and/or software code and continue to retain or use them for commercial exploitation. This evidence is relevant and necessary for Reliq's preliminary injunction request.

25.   *Second*, the purpose of the expedited discovery is to prevent further destruction of evidence and give the Court a more complete record on which to rule. As the testimony of Digital Forensics makes clear, Defendants have engaged in the systematic, widespread, and intentional destruction of evidence. *See* Rotilie Declaration, Exhibit B attached hereto.

26.   Defendants' acts of spoliation include, but are not limited to:

- Stephen Samson deleted all data on the hard drive of his Reliq-owned MacBook through a "factory reset", then reinstalled all of the software and created a new user on December 8, 2018, 4 days **after** his resignation from Reliq. Reinstalling software after a reset makes it impossible to recover any of the data that was originally on the laptop. By December 6, 2018 Samson had been specifically instructed in writing by Reliq's Canadian counsel NOT to delete or alter the files on the laptop prior to returning this company property to Reliq.

- Defendant Deveros logged into his Reliq Laptop on three separate occasions on December 4 and 5, 2018, all **after** his resignation from Reliq.

- Without the knowledge or permission of Reliq, Samson searched the email logs of Reliq's CEO, Lisa Crossley, on at least the following dates: October 31; November 1, 26 and 30, 2018.

- Samson logged in to his Reliq laptop on December 6, 2018, two days **after** his resignation from Reliq.

- On December 3, 2018, the day before her resignation from Reliq, Defendant Shelby Neal downloaded company files and folders from Reliq's confidential Google Drive and downloaded a Google Takeout archive.

- The day before and hours after his resignation on December 4, 2018, Deveros downloaded two Google Takeout archives from Reliq's G Suite.

- On the day of his resignation, December 4, 2018, Claudio Damaso initiated a bulk download of multiple files and folders and downloaded a Google Takeout archive from Reliq's confidential Google Suite. Claudio Damaso also moved a large number of Reliq files onto a flash drive. Among the files Damaso transferred from his Reliq laptop to a personal flash drive are the following: a Reliq client contract; the iUGO Sales PowerPoint slide deck; the iUGO Sales Tracking spreadsheet; Reliq's NDA template; and a copy of a $25,000 USD database of sales leads Reliq purchased from Definitive Healthcare. Damaso also deleted a large number of files.

- On December 3, 2018, the day before his resignation, Samson performed keyword searches of Crossley's Reliq email account.

- On December 3, 2018, the day before his resignation, Samson visited the Google Help topic "Wipe Chrome device data – Google Chrome Enterprise." When Reliq's Chromebooks were returned by Neal, Damaso and Deveros later that week, they had been wiped of all data.

- On December 3, 2018, the day before his resignation, Samson downloaded a Google Takeout archive from Reliq's confidential G Suite.

- Damaso's MacBook remains locked; no password he has provided allows access; we do not know if Damaso also wiped his MacBook by (as Samson did) deleting all data using a factory reset.

*See* Rotilie Declaration, <u>Exhibit B</u> attached hereto.

27. Defendants' conduct in wiping the hard drives of the three key computers is exceptional and egregious; Plaintiff may file a motion to strike Defendants' pleadings and enter a default judgment on liability once the full scope of the evidence destruction is known. *See, e.g.*, *Quantlab Techs. Ltd. (BGI) v. Godlevsky*, 4:09-CV-4039, 2015 WL 1893531, at *1 (S.D. Tex. Apr. 27, 2015) ("[A] terminating sanction is justified in only the most egregious cases, such as where a party has engaged in perjury, tampering with evidence or intentionally destroying evidence by burning, shredding, or ***wiping out computer hard drives***." (Emphasis added)) (Ellison, J.).

28. Because Defendants wiped their hard drives, depositions are needed to assist Plaintiff in determining the full scope and effects of the spoliation that Defendants perpetrated.

Similarly, because Defendants wiped their hard drives, the documentary evidence sought in Plaintiff's discovery requests (*i.e.*, the communications between and among Defendants) likewise rests in the exclusive control of Defendants, if it still exists at all. Such discovery is reasonably calculated to lead to the discovery of admissible evidence that Defendants did indeed steal trade secrets and conspire amongst themselves to do so.

29. A comparison of Plaintiff's software code and the infringing software code will provide admissible evidence of both copyright infringement and theft of trade secrets. Plaintiff's software took years and millions of dollars to develop. Defendants claim they developed in two months (in their spare time) an improved code - while they were working full time for Reliq! Such an assertion is ludicrous on its face. Moreover, Defendants' concealment of their ownership of Evelyn – which they have judicially admitted – further justifies a comparison of Evelyn's code with Reliq's code. If Defendants had nothing to hide, why did they actively conceal their ownership of Evelyn? Dkt 9-1, ¶15 (Samson Declaration "I did not disclose to Reliq . . . our ownership interest in Evelyn.")

30. Defendants have admitted they possessed and used the iUGO source code, "manipulating it," through Accuhealth. (Dkt 9-1, Samson Declaration, ¶11; Dkt 9-2, Deveros Declaration, ¶6). *See also* Declaration of Matt Drew, <u>Exhibit B</u> to Plaintiff's Consolidated Response to Defendants' TCPA Motions to Dismiss. Defendants still have Reliq's iUGO code. Reliq is entitled to confirm that its code is incorporated into and being used as part of the software code that Defendants are marketing and using.

31. Brazenly, Defendants called their new software "**iUGO** v. 3" – incorporating the **same name** as Reliq's software. *See generally* Dkt. No. 6. Good cause exists to believe that a source code comparison will result in additional clear and specific evidence of Plaintiff's claims.

*See, e.g. Nearstar, Inc. v. Waggoner*, 4:09-CV-00218, 2010 WL 11531229, at *2 (E.D. Tex. Mar. 15, 2010) (compelling production of source code for examination in a copyright infringement case when the defendant had previously worked for the plaintiff developing the code and the programs at issue had numerous functional similarities).

32. ***Third***, the requested discovery is narrowly tailored to the issues which must be decided at the outset of the litigation. Reliq requests: (a) limited depositions of each Defendant; (b) internal communications between and among Defendants while they were working for Reliq and continuing thereafter at least until the date the lawsuit was filed; and (c) an expert comparison of Reliq's code against the infringing software code. This is not open-ended discovery, and imposes a minimal burden compared to the extraordinary burden resulting from Defendants' decision to destroy evidence, which requires a costly and time-consuming forensics investigation to detail.

33. ***Finally***, although the Rule 26 conference has not occurred, Defendants have filed motions to dismiss based on evidentiary challenges. Surely, Defendants must be prepared to engage in discovery of the evidence.[3] Moreover, to the extent it makes any difference, Plaintiff is ready, willing and able to have the Rule 26 conference at any time; Plaintiff previously suggested that the Rule 26 conference be held on March 15, 2019. For all of these reasons, expedited discovery should be granted.

**II.     The Texas Citizens' Participation Act ("TCPA") does not bar Reliq's discovery.**

34. Defendants may resist discovery on the basis that the TCPA—a state court statute—imposes a discovery stay on this Court. As argued in the Consolidated Response to Defendants'

---

[3] Previously, Reliq asked that all documents that Defendants copied from Reliq, whether through a Goodle Take-out or otherwise, be produced. Defendants have agreed to provide all such documents, although they have not yet been produced.

motion to dismiss, the TCPA is a state procedural statute that does not apply in U.S. federal court. Even assuming, however, that some substantive portions could be applied (and that is vigorously contested), the TCPA procedures <u>directly</u> conflict with this Court's power to set a schedule for discovery under Rule 16.

35. **Consistent with Federal Rules of Civil Procedure 26, 30, 31, 33, 34, 36, the scope of discovery (and timeline to respond) are determined by this Court, not some state statute.** Thus, the TCPA is not an obstacle to conducting any discovery permitted by the Federal Rules of Civil Procedure. Plaintiff's discovery should be permitted on this basis alone; it is proportional to the needs of the case and reasonably calculated to lead to the discovery of admissible evidence. *See* Fed. R. Civ. Proc. 26.

36. If, for some reason, the Court decides to hold Plaintiff to the procedural standards imposed by the TCPA, the result is no different. Even the state statute provides that, upon a showing of good cause, limited discovery on the issues related to the motion is available to the non-movant. Because the TCPA threatens dismissal of claims at the outset of a case, the statute imposes a minimal standard to obtain discovery on the issues relevant to the motion. *In re IntelliCentrics, Inc.*, 02-18-00280-CV, 2018 WL 5289379, at *3 (Tex. App.—Fort Worth Oct. 25, 2018, no pet.).

37. Under the TCPA, all a party must do is show that "good cause" exists to obtain discovery. Tex. Civ. Prac. & Rem. Code § 27.006(b) ("On a motion by a party or on the court's own motion and on a showing of good cause, the court may allow specified and limited discovery relevant to the motion."). On a showing of good cause, "discovery must be sufficiently broad to cover all essential elements of all of the challenged claims" under the TCPA. *IntelliCentrics, Inc.*, 2018 WL 5289379, at *3.

38. Courts routinely permit plaintiffs to conduct discovery under the TCPA where, as here, facts pertinent to the motion to dismiss rest in the exclusive control of the defendants. *E.g.*, *In re IntelliCentrics, Inc.*, 02-18-00280-CV, 2018 WL 5289379, at *2 (Tex. App.—Fort Worth Oct. 25, 2018, no pet.) (permitting discovery notwithstanding a motion to dismiss under the TCPA because "the purpose of discovery is to seek the truth so that disputes may be decided by what the facts reveal, not by what facts are concealed"); *In re Bandin*, 556 S.W.3d 891, 895 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (permitting depositions of the defendants).

39. In *Charalambopoulos v. Grammer*, 3:14-CV-2424-D, 2015 WL 390664, at *19 (N.D. Tex. Jan. 29, 2015), the Northern District of Texas (Judge S. Fitzwater, Presiding) considered a request for discovery in a defamation case, holding:

> Because Charalambopoulos seeks discovery of evidence that is effectively within the exclusive control of Grammer and/or her agents, and this evidence may enable him to establish by clear and specific evidence a prima facie case as to the remaining grounds for his defamation claims, the court grants in part his motion for discovery under § 27.006(b).").

40. Here, good cause exists for the same reasons already articulated: (1) Defendants have engaged in the widespread destruction of relevant evidence, requiring additional evidence to reconstruct the record; and (2) the Plaintiff's code that Plaintiff reasonably believes was copied by Defendants and integrated into new software being used by Defendants (as well as their secret communications between and among each other during the last twelve months) are not within Plaintiff's possession or control.

**41. A scheduling order should be set to permit the requested discovery.**

42. Discovery ought to proceed in an orderly fashion, as even those federal courts that have applied the TCPA recognize. Judge Fitzwater set a sensible schedule to conduct such

discovery in *Charalambopoulos v. Grammer*, 3:14-CV-2424-D, 2015 WL 390664, at *28 (N.D. Tex. Jan. 29, 2015).

43. Following Judge Fitzwater's lead, Plaintiff requests the following schedule: (1) 60 days for Plaintiff to conduct the requested discovery; (2) 30 days from the close of that discovery for Plaintiff to file a Supplemental Response with additional evidence to Defendants' Motion to Dismiss; and (3) 10 days from the filing of Reliq's response for Defendants to file any reply they feel appropriate.

## PRAYER

44. Plaintiff respectfully asks that this Court authorize the expedited discovery sought in this Motion. Reliq additionally requests an order from the Court ordering each party to preserve all evidence related to the issues of this case so that any further spoliation can be managed under this Court's contempt power. If, for some reason, this Court determines that the TCPA does apply to this case, then Reliq also requests that this Court enter a Scheduling Order, as outlined above, for the taking of discovery and supplementation of Reliq's Response to Defendant's Motions to Dismiss under the TCPA. Plaintiff requests any and all such further relief to which it may be entitled in equity or at law.

    Respectfully submitted,

    */s/ Paul D. Clote*
    PAUL D. CLOTE
    Federal Bar No. 7437
    Texas Bar No. 04407300
    MARCUS V. EASON
    Federal Bar No. 2609087
    Texas Bar No. 24092374
    MCGINNIS LOCHRIDGE LLP
    711 Louisiana, Suite 1600
    Houston, Texas 77002
    pclote@mcginnislaw.com
    meason@mcginnislaw.com

MITCHELL C. CHANEY
Federal Bar No. 1918
State Bar No. 04107500
MCGINNIS LOCHRIDGE LLP
600 Congress Ave, Suite 2100
Austin, Texas 78701
(512) 495-6000
(512) 495-6093 Fax
mchaney@mcginnislaw.com

ATTORNEYS FOR PLAINTIFF
RELIQ HEALTH TECHNOLOGIES, INC.

**CERTIFICATE OF CONFERENCE**

I hereby certify that on and before March 15, 2019, I conferred with counsel for Defendants regarding the discovery sought in this Motion for Expedited Discovery, and Defendants' counsel advised that they were opposed to the relief sought herein.

*/s/ Paul D. Clote*
PAUL D. CLOTE

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record were served with the foregoing document in accordance with the Federal Rules of Civil Procedure, via the Court's electronic filing system, on March 18, 2019.

*/s/ Paul D. Clote*
PAUL D. CLOTE