UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RELIQ HEALTH TECHNOLOGIES, INC., | § | |
|     Plaintiff, | § | |
| | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:19-cv-00040. |
| | § | |
| SHELBY NEAL and ACCUHEALTH | § | |
| TECHNOLOGIES, LLC | § | |
|     Defendants. | § | |
| | § | |

## DECLARATION OF LISA CROSSLEY, Ph.D.

1.      "My name is Lisa Crossley.  I am the Chief Executive Officer ("CEO") of Reliq Health Technologies, Inc. ("Reliq" or the "Company").   I have been the CEO of Reliq since January 2016.  I hold a B.Sc. in Anatomy & Cell Biology from McGill University, and a B.A.Sc. and Ph.D. in Chemical Engineering from Queen's University.  I am a licensed Professional Engineer in the Province of Ontario.

2.      "As the CEO of Reliq, I have directed an investigation of the facts and events relating to Stephen Samson and those former Reliq employees and consultants who worked for Samson.  I am giving this Declaration as the CEO of Reliq and as the corporate representative knowledgeable about the facts and events involving Stephen Samson and those persons and companies affiliated with him.  I have personal knowledge of all facts stated herein and/or I have acquired knowledge as Reliq's CEO and corporate representative of the facts stated.  I am sound of mind and body, and I am fully competent to make this Declaration.  I hereby confirm under the penalty of perjury that all statements in this Declaration are true and correct.

3.      "Prior to my employment with Reliq, I was the CEO of VitalHub Corp. for four years and four months.  Prior to my employment with VitalHub Corp., I was the CEO for Quantum


EXHIBIT
A

Dental Technologies for one year and five months.  Prior to my employment with Quantum Dental Technologies, I was the President and CEO of Natrix Separations, Inc. for five years and five months.

4.      "When I joined Reliq as its CEO, the Company was called Moseda Technologies, Inc.  (In May 2016, Moseda Technologies, Inc. changed its name to Reliq Health Technolgies, Inc.).  At the time, the Company was focused on Mobile Secure Data (MoSeDa) for healthcare. Prior to my joining the company in January 2016, in the summer of 2015 Moseda (known at the time by the name MobSafety) became publicly listed through a Reverse Takeover of a mining company, a common route to public listing in Canada. I was hired as Moseda's CEO due, at least in part, to my past experience as CEO for other healthcare technology companies.

5.      "In February 2016, Reliq acquired CareKit Health Corporation ("CareKit") to replace the Company's existing software offering.  Prior to the acquisition, CareKit had been developing telemonitoring software for remote patient monitoring.  This software later would become known as Reliq's "iUGO" software platform.   In my role as CEO of Reliq, I have personal knowledge of CareKit's business.

6.      "In January 2016, prior to Reliq's acquisition of CareKit, Stephen Samson ("Samson") signed an Advisory Board Services Agreement with CareKit Health Corp., to provide expertise to CareKit in the area of mobile applications.  In 2017, on the advice of the then Chief Visionary Officer, Mr. Giancarlo De Lio, Reliq engaged Samson as a consultant.  Mr. De Lio indicated that he and Mr. Samson had been best friends since Grade 9, that Samson had been the best man at De Lio's wedding and that they spent time with one another's families every year over the Christmas holidays.  De Lio asserted to me and our then-CFO, Aman Thindal, that Samson was trustworthy, loyal and a "cybersecurity genius", and that engaging Samson would greatly

accelerate the development and commercialization of Reliq's iUGO platform.  Reliq granted Samson a total of 300,000 stock options in 2017 as compensation for his consulting services: 200,000 options were granted in May 2017 and an additional 100,000 options in September 2017.

**Samson – Reliq's Chief Information Officer & Secret Owner of Evelyn Technologies**

7.      "On January 30, 2018, Samson officially joined Reliq full-time to serve as its Chief Information Officer.  By this time, Samson had had access to the software Reliq named "iUGO," and had worked with the development teams for over two (2) years.

8.      "From January 30, 2018 to October 4, 2018, Samson did not make any complaints to me about the iUGO software, software on which he had worked for more than two years.  In fact, on August 29, 2018, when iUGO version 2.0 was released, Samson told me that "V2 was a success" and as a result, recommended that I give the staff a day off as recognition of their achievement.  A true and correct copy of this communication is attached hereto as Exhibit "A-10"

9.      "Therefore, it came as quite a surprise when, on October 4, 2018, Samson informed me during a lunch meeting he requested which took place at Kelly's Landing in Toronto, ON Canada, that the iUGO software did not work and could not be used by Reliq going forward.   I asked Samson if there was any way the software could be salvaged and he assured me it could not.  I asked him what options we had at this point and he informed me that there were several alternatives that he had been exploring. He assured me that he would find a suitable replacement software that could be licensed for less than Reliq was currently spending on contract development and internal software development resources.  The next day, Samson recommended to me and our then-CFO, Aman Thindal, that Reliq license software supposedly owned by a company called "Evelyn Technologies."

10.     "We have since learned that there is an Evelyn Technologies, LLC ("Evelyn") and

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 3*

an Evelyn Technologies Canada, Inc ("Evelyn Canada").  At the time, Samson informed me and
Thindal that he and his team would leave Reliq if we did not move to the Evelyn software as there
was no possibility of making the existing iUGO platform work.  Samson stated, however, that the
Evelyn software had "everything that Reliq needed" and licensing it would reduce the company's
burn rate.

11.     "I asked Stephen Samson multiple times during October 2018 whether he had any
ownership in or affiliation with Evelyn.  Samson repeatedly assured me and others on the
Management Team that he did not.  I have since learned that this was false.  As a public company,
Reliq could not have entered into a material contract with Evelyn if one of Evelyn's owners also
was an officer at Reliq.  Both I and Reliq's CFO at the time, Aman Thindal, explained this to
Samson and he told us both repeatedly, expressly, that he did not have an interest in Evelyn.

12.     "Samson, who was representing Reliq in discussions with Evelyn (which we now
know that Samson owns in whole or in part),  assured me and the rest of the Management Team
repeatedly that the Evelyn software would be fully operational by November 1, 2018 and could be
used in Reliq's planned pilots in Florida.  As a result of Samson's misrepresentations, among
others, regarding: (a) the alleged inability of Reliq's iUGO software to perform; (b) Samson's lack
of ownership in Evelyn; and (c) the alleged ability of Evelyn to accomplish everything that Reliq
needed, Reliq entered into a contract with Evelyn to license Evelyn's software.

13.     "Once November 2018 arrived, it became very apparent that the Evelyn software
did not work, and we were unable to kick off the planned pilots in Florida.  Despite what Samson
had represented to us, the Evelyn software was unable to work for its intended purpose; the user
interface was still very rudimentary; it did not connect to the required medical devices; it could
not be demonstrated to customers or Reliq internal employees; and it was not HIPAA compliant.

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 4*

14. "Reliq did not then, and does not now have access to the Evelyn source code.  On November 16, 2018, Samson removed all access for Reliq's Chief Medical Officer, Dr. Sztramko, to view even the user interface for the Evelyn software.  As a result, Reliq never rolled out the Evelyn version of its software.  Reliq never authorized any person, firm or company to use any software that was based on Evelyn as a Reliq product.  By late November 2018, Reliq's Management team (excluding Samson) had recognized that Evelyn had materially misrepresented its capabilities and intentions, and began exploring alternative options.

15. "On November 16, 2018 in the Management group chat for Sztramko, Thindal, Samson and myself, we were trying to set a time for a call to discuss Evelyn and the sales pipeline. Samson suddenly informed me that he was going to be offline all of the next week (Nov. 19-23, 2018) because he was going to his condo in Panama for U.S. Thanksgiving.  He had not requested time off for vacation or provided any notice.  The timing of his absence effectively prevented Reliq from getting any answers to our questions about Evelyn for another week.

16. "On November 21, 2018, Reliq's Chief Medical Officer, Dr. Richard Sztramko, VP Clinical Innovation, Leo Godreault, and I met with George Rayner, the purported owner of Evelyn. At this meeting, Godreault asked Rayner, in my presence, whether Samson had previously been involved with Evelyn, or had any ownership in or other relationship with Evelyn. George Rayner stated that Samson did not, but that he had tried to hire Samson as his CTO several months earlier, but Samson turned him down. In that same meeting, I personally asked George Rayner if he had any partners at Evelyn; he said, "Just one, Ray." He declined to provide his partner, Ray's, last name.

17. "Godreault asked Rayner when he acquired Evelyn; Rayner indicated it was in the summer of 2018, a few months prior.  Godreault asked what software Evelyn had built at that time

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 5*

and Rayner indicated that they hadn't really built anything by that time. Godreault said "Oh, so you basically just acquired the developers" and Rayner agreed.  I asked Rayner which devices Evelyn could currently connect to and he stated that he needed us to provide a list of the devices we wanted to connect to, so his team could start working on integrating those devices.  Rayner subsequently emailed me that evening asking for the list of required devices.  I prepared a draft list and circulated to Samson, Godreault and Sztramko.  On the list were multiple devices that Samson had previously assured me Evelyn could already connect to.  Samson's response to my email was that he had another list he had prepared to support the planned roll out in Mexico and he would share that list so we could add the devices in my list. At no point did Samson address the fact that he had repeatedly assured us, prior to Reliq signing the contract with Evelyn, that Evelyn already connected to all of the devices on my list.

18.    "On November 26, 2018, Thindal, Sztramko, Godreault and I agreed that we would need to address the problem of Samson being the only person who had Super Administrator privileges for Reliq's G Suite and login credentials to all of Reliq's other IT tools.  I texted Samson asking him to make me a Super Admin.  Samson tried to convince me that I wouldn't actually want to be a Super Admin because it would be too inconvenient, so instead I suggested in the Management group chat that Samson make Sztramko a Super Admin.  Samson again provided various reasons why Sztramko wouldn't want to be a Super Admin. Thindal then texted that one of the Board Directors would need to be given Super Admin privileges. Samson never responded.

19.    "Over the next 8 days, the Board Director emailed Samson, and Thindal and I emailed and texted Samson multiple times asking that Samson make the Director a Super Admin. Samson made various excuses and ultimately flatly refused to provide the credentials, saying he would only have time to do so when I met with him in Texas on December 4, 2018.

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 6*

20.   "On December 4, 2018, after Samson and Deveros informed me that they were resigning, I told Samson "We'll need you to hand over Super Admin privileges," to which Samson responded "Super Admin! Ha!", and nothing else.  Ultimately Reliq had to have our attorneys demand that Samson return access to all of Reliq's IT systems and supervise the handover of credentials, which Samson finally provided at the end of the day on December 6, 2018.

21.   "On November 28, 2018, Samson cancelled a planned Evelyn demo/development planning meeting that had been scheduled with Reliq's clinical team. On November 28 and November 29, 2018, Sztramko, Godreault, Thindal and I attempted to obtain answers from Samson and Rayner regarding basic properties of the Evelyn software and Evelyn's development process. Samson became extremely defensive every time we attempted to obtain any information about the Evelyn platform. Rayner declined to respond to our questions at all.

22.   "By November 30, 2018, Sztramko, Godreault, Thindal and I had agreed that there was something very suspicious about Evelyn and that Reliq would have to withdraw from the contract. That same day, Samson texted me complaining that his credit card was declined when he was trying to book flights for himself and Deveros to travel to Australia in January to kick off two pilots there.  Thindal and I had authorized Samson and Deveros to travel to Australia for two weeks to work with the pilot sites and our business development consultants in Adelaide.  I asked Samson to send me the flights he wanted me to book.  He did so on December 1, 2018, at which point I discovered that Samson and Deveros were planning to spend a week in Sydney, Australia not on Reliq business, prior to flying to Adelaide.  After two weeks in Adelaide they then planned to fly to Taipei, Taiwan on Reliq's dime and spend a week there.  They had never obtained my or Thindal's permission to be away for a month or to take two weeks' vacation with Reliq paying for flights to their vacation destinations.  Samson indicated to me and to Thindal that he expected the

trip to cost approximately $50,000.  On December 1, 2018 I instructed Thindal to cancel Samson's corporate credit card to prevent him from trying to book flights to Australia.

23.     "On December 3, 2018, Reliq discovered that Samson and Deveros had incorporated a Canadian company called Evelyn Technologies Canada, Inc.  At that time, Sztramko, Godreault, Thindal and I strongly suspected that Samson had a beneficial interest in the Evelyn Technologies LLC, incorporated in Delaware, as well.  Since it was apparent that the Evelyn software was unable to perform as Samson had promised; and since Samson had caused Reliq to switch from iUGO version 2 to the Evelyn software, it became clear that it was highly likely Samson had a personal financial interest in Evelyn and in the multi-million dollar contract that he caused Reliq to sign with Evelyn.  At that point, Reliq began preparations to terminate Samson's employment.  On December 3, 2018 when Samson learned that Reliq had not yet made the monthly payment to Evelyn, Samson became extremely agitated, and even when I reminded him via text that he worked for Reliq, not Evelyn, he continued to lobby to have Evelyn paid immediately.  Samson, Deveros and Neal, along with the rest of Samson's team, abruptly resigned the next day, December 4, 2018.

24.     "Reliq's investigation has revealed that the Certificate of Formation of Evelyn Technologies, LLC was filed on October 5, 2018 – the day after Samson informed me that Reliq's iUGO software does not work and is not salvageable. Attached to my Declaration as Exhibit A-1 is a true and correct copy of the Certificate of Formation of Evelyn Technologies, LLC from the Delaware Secretary of State. On October 30, 2018, two days before Reliq's contract with Evelyn USA became effective, Samson and Deveros incorporated Evelyn Technologies Canada, Inc. Attached to my Declaration as Exhibit A-2 is a true and correct copy of the Certificate of Incorporation of Evelyn Technologies Canada, Inc. At all times, Samson and Deveros actively

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 8*

concealed their ownership of and beneficial interest in Evelyn and Evelyn Canada.

25. "We now know that Samson and Deveros were actively concealing their ownership of Evelyn Canada and knowingly conspiring with Rayner to defraud Reliq of millions of dollars for an unnecessary software platform.  Contrary to Samson and Deveros' false statements, our own iUGO platform was and is functional, stable, secure and scalable). Had the fraud not been discovered, Samson, Deveros and Rayner stood to receive millions of dollars from the Evelyn software licensing contract with Reliq.

26. "As part of the conspiracy to conceal Samson and Deveros' ownership in Evelyn, George Rayner signed the Evelyn contract with Reliq.

27. "Since my meeting with Samson on December 4, 2018, I have confirmed that – contrary to the express misrepresentations of Samson and Deveros to me, Reliq's Management Team and Reliq's Australian business development consultants – there was nothing wrong with Reliq's iUGO software.  In fact, based upon the findings of two separate, independent expert software developers, I have verified that the iUGO version 2 software did work for its intended purposes, and was scalable (expandable) to the levels Reliq desired.

28. "Since December 4, 2018, I have also learned that Samson took steps to sabotage Reliq's iUGO software.  Reliq's business plan for the iUGO software includes three (3) modules: remote patient monitoring ("RPM"); chronic care management ("CCM"); and telemedicine. Previously, our contract software developer Cecropia Solutions ("Cecropia") had been working on enhanced features to RPM and CCM as well as completing the Telemedicine Module.  On June 8, 2018, Samson instructed Cecropia to stop working on the telemedicine module.  This software module represented a major feature by itself as well as a significant value added feature to RPM and CCM.  At the same time, Samson told Cecropia to stop working on the Telemedicine Module,

he had told me only two days prior that the Rio Grande Valley Health Alliance ACO would go live with Telemedicine on July, 8th, 2018.  A true and correct copy of this communication is attached hereto as Exhibit "A-11."

29.    "I later learned that on October 16, 2018, Samson falsely asserted to Cecropia that Reliq did not own the intellectual property related to the iUGO software platform, and that the iUGO software was infringing on a third party's intellectual property.  Samson instructed Cecropia to immediately stop all work of any kind on the iUGO software.  Contrary to Samson's representation otherwise, Reliq owns and did own at the time the iUGO intellectual property and it did not and does not infringe on any third party's intellectual property. At the same time, Samson told me and Thindal that Cecropia had ceased work on the iUGO platform because they acknowledged that the software was non-functional.

30.    "There was no need for Reliq to cease using iUGO software.  Contrary to Samson's representations otherwise, the iUGO software worked perfectly well; and Reliq owned the software.  By pressuring Reliq to sign the contract with Evelyn, Samson set in motion a deceitful plan to enrich himself at the expense of Reliq and its shareholders.

**Stephen Samson & Accuhealth**

31.    "Paz Home Health, LLC ("Paz") was Reliq's largest client at that time.  I have learned that in June 2018, Samson and Deveros attempted to purchase Paz.  The day after Samson and Deveros met with the owner of Paz, the owner called me to tell me that Samson and Deveros had threatened to ruin Paz's business and steal Paz's patients if she did not sell Paz to them.  I spoke to De Lio immediately afterwards and he assured me that none of these claims could be true, as he had known Samson for 20 years and they were best friends. Samson also texted me denying that he had threatened the owner of Paz, saying that he did think that it would be a good idea for

Reliq to purchase a home health agency but that he had never pressured Paz to sell to him. I have since become aware that Samson continued his harassment of the owner of Paz, and that the owner ultimately filed complaints via email with both the Texas Department of Health and Human Services and Office of Inspector General of the Health and Human Services of the United States.

32.     "In late June 2018, Samson told me that he while he was not definitely not interested in purchasing Paz, he did think it would be a good idea for him to purchase a home care agency. Samson told me that the agency he wanted to purchase would become a client of Reliq; would be able to provide valuable feedback as a user of Reliq's software; and would use its connections to seek additional clients for Reliq.   Samson told me that his lawyer, Arturo Torres, requested that Reliq sign a waiver releasing Samson and another employee, Boby Deveros, from their non-compete agreements to allow them to purchase a home care agency.  I believed that Samson and Deveros had Reliq and its shareholders' best interests at heart as I did, and in good faith agreed to sign the waiver their attorney provided.

33.     "On July 18, 2018, Samson sent me a client agreement for a potential client named Accuhealth Technologies, LLC ("Accuhealth").  He did not tell me this was a company he had purchased or owned.   The agreement contained such favorable terms to Accuhealth that I questioned why Reliq would ever enter into such an agreement.  Only then did Samson admit to me that he owned Accuhealth.  I explained to Samson that Reliq could not provide preferential treatment to  any one of its clients, especially if that client was owned by a Reliq employee.  I also explained to Samson that Accuhealth was not permitted to solicit Reliq's current clients' contacts, specifically citing the various physicians who referred patients to Paz.

34.     "Samson represented to me that Accuhealth would never seek Reliq's existing or prospective customers.  To the contrary, Samson stated that this would be a big win for Reliq and

would help the company develop a much better understanding of our clients' processes.  That would help us develop tools to streamline eligibility screening, onboarding and claims submission.. Relying on Samson's representations and acting in good faith, Reliq signed a standard client agreement (the Software License Agreement) and a partnership agreement (the Resource Agreement) with Accuhealth.

35.     "At no time did Reliq agree to give Accuhealth free reign to use the iUGO name or mark on any software or other products not authorized by Reliq.  At no time did Reliq agree to allow Accuhealth to access or copy the source code on which the iUGO platform was based.  At no time did Reliq agree to allow Accuhealth to decide what software or products Reliq would market under the iUGO name.  Reliq entered into the agreement with Accuhealth only because Samson convinced me and Thindal that Reliq would greatly benefit when Accuhealth secured clients and onboarded patients to the iUGO platform.  He said that Accuhealth would provide valuable real world testing, feedback and suggestions regarding Reliq's iUGO software.

36.     "On July 20, 2018, Samson told me that his company, Accuhealth, had hired Paz's Director of Nursing.  Previously, Samson assured me he would not do so, after Paz's owner complained to me in June about Samson's contact with her Director of Nursing, expressing concern that Samson was trying to solicit him away from Paz to Accuhealth.  Samson's actions in hiring Paz's Director of Nursing negatively impacted Paz's business, which in turn had a negative impact on Reliq's business.  Reliq's relationship with Paz was seriously jeopardized due to Samson's actions.

37.     "On October 28, 2018, Samson texted a Reliq employee, Eric Ditkowsky (a sales executive  working within Reliq's Sales organization, which was managed by Samson at the time) offering to pay "kickbacks" to Ditkowsky if he secured clients for Accuhealth. Samson texted,

"accuhealth will give you a kick back – dbl up on that $$$." A true and correct copy of the text message from Samson to Ditkowsky proposing to pay the kickback is attached hereto as Exhibit A-3.

38.     "Samson and Deveros resigned from Reliq on December 4, 2018 during a meeting I had previously scheduled with them in McAllen, Texas.  That meeting was to be the first meeting of several over a two day visit in which I was to meet with Reliq's clients and prospective clients in the Rio Grande Valley along with Samson, Deveros and other Reliq employees.  In this meeting, Samson and Deveros informed me that they (and Shelby Neal) were leaving Reliq effective immediately to work at Accuhealth.

39.     "On December 4, 2018 and December 5, 2018, Samson (along with his partners Boby Deveros and Claudio Damaso) told several Reliq clients that Reliq would be leaving the Rio Grande Valley.  Such statement was false then, and is false now.

40.     "After December 4, 2018, I discovered that Accuhealth had been marketing a software called "iUGO version 3."  This software was, in fact, the software Evelyn had been developing.  However, Reliq has never authorized any iUGO version 3 or the use of Evelyn software.  Accuhealth attempted to steal Reliq's clients by labeling their software "iUGO version 3."  Reliq has never approved or authorized the release of a "version 3" of its iUGO software.

41.     "Reliq has a valid trademark of the iUGO name in Canada.  Reliq has been using the iUGO mark in the United States and in South Texas since May 2016.  Reliq never authorized Accuhealth to use Reliq's iUGO mark for any purpose other than to promote the use of Reliqs iUGO v2.0 by Accuhealth.  Reliq has never authorized Accuhealth to determine what software Accuhealth will call "iUGO."  Accuhealth's use of the "iUGO" mark is misleading because it claims to be a Reliq product when it is not.

42.     "When I was informed by Accuhealth's Director of Nursing, David Hernandez, via email on December 8, 2018 that they were using a software called iUGO v3.0, I informed him that there was no iUGO v3.0 and that if his customers were using software called iUGO v3.0 it was not made or supported by Reliq.  Mr. Hernandez then emailed stating that "The iUGO v3.0 application I'm referring to is Reliq's solution that your implementations team started deploying to my home health agency, physicians, and patients since mid November."  In November 2018, the Reliq Implementation team consisted of Samson, Deveros and Neal, all of whom left Reliq on December 4, 2018 to work for Accuhealth.  Accordingly,  Accuhealth was defending its use of Reliq's iUGO brand on Evelyn software by claiming that Samson, Deveros and Neal, acting as Reliq, had given themselves – acting as Accuhealth - binding authorization to use the iUGO brand for the Evelyn software.

43.     "Accuhealth's unauthorized use of Reliq's iUGO trade name and mark is likely to cause confusion among Reliq's customers.  In fact, Accuhealth's actions have caused actual confusion among Reliq's customers.  One of these customers is Criterion Healthcare, Inc. ("Criterion").

44.      "Christina Lipton is the Director of Finance and Accounting at Criterion.  Ms. Lipton contacted me because of the confusion caused by Samson, Deveros, and Accuhealth's use of the iUGO name, and their attempt to roll out a new iUGO software version without Reliq's authorization.

45.     "In my email correspondence from Christina Lipton, Ms. Lipton stated that: "[w]e believe Reliq offers the best platform on the market for the remote monitoring program we offer our patients in Texas.  Based on everything that has transpired and our serious concerns about the misinformation we have been subject to, we are requesting a meeting with you to discuss plans

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 14*

moving forward."  A true and correct copy of my email communications with Christina Lipton are attached hereto as Exhibit A-4.  These communications were made in the course of my duties as CEO of Reliq, on the dates and times indicated, and they were kept in the regular course of business.

46.    "I had several phone conversations in December 2018 with Christina Lipton and other members of the Criterion Management team to clear up the misinformation perpetrated by Accuhealth and its representatives.  Criterion continues to use iUGO Version 2.0.

47.    "In addition to Accuhealth's unauthorized use of the "iUGO" mark, I reasonably believe that Accuhealth (through Samson and Deveros) have misappropriated all or part of Reliq's software code, and have incorporated Reliq's code into the software being used by Evelyn.  It is necessary to compare Evelyn's code with Reliq's code to determine what portions of Evelyn's code may have been misappropriated by Samson and those working with him.

48.    "I have reviewed Samson's Declaration where he claims to have developed the Evelyn Software over "a relatively short period of time."  The iUGO software, which actually does work and does accomplish its intended purpose (unlike the Evelyn software as of November 2018), took an average of 12 software programmers working for two years on the initial development and an average of 27 full time software developers from Cecropia working for a further eight (8) months to create the enterprise grade healthcare software platform that was iUGO in October, 2018.

49.    "The idea that Samson and Deveros developed an enterprise grade software platform that operates similarly to, or based on their claims, superiorly to, Reliq's iUGO platform in a few months while also supposedly working full-time for Reliq defies common sense.

**Samson Email Snooping and Privacy Violations**

50.     "Since the filing of this lawsuit, I have learned through an independent digital forensic investigation that Samson was accessing and performing keyword searches of my emails. At no time did Samson have authorization to do so.  There is nothing in Reliq's company policies or agreement that allows Samson to access my email account or the account of any other active Reliq employees, and this is a clear violation of standard practices for a CIO.  As CIO, Samson had Super Administrator Credentials for all Reliq IT systems.  That Super Administrator credential gave Samson the ability to use a back door method (Google Takeout) to access any employee's files, emails, chats, contacts, calendars, etc. and all of the information on our entire G Suite system. Samson also provided Deveros and Neal with Super Admin access, without my prior consent or knowledge.  Given that Deveros was a contractor, Neal was a junior employee, neither was responsible for IT Administration and neither were part of the Senior Management team, I would never have authorized providing them with Super Admin privileges.

51.     "Reliq uses Google's G Suite for Business cloud service for email, group chat, videoconference, contacts, calendar and file storage.  Reliq's confidential and proprietary documents and information are stored in the cloud on Google Drive.   Reliq is an international business with employees and clients in multiple countries and across the United States.  Each of Reliq's computers is used to conduct Reliq's business worldwide.

52.     "On March 5, 2019 we learned that on or after their resignation dates, Samson, Deveros and Neal downloaded and still to this date have retained files, emails and other proprietary and confidential data belonging to myself and multiple other Reliq employees, including their own files and files originally belonging to CareKit prior to its acquisition by Reliq, despite Samson, Deveros and Neal terminating their employment with Reliq on December 4, 2018.

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 16*

53.     "At no time did Samson Deveros or Neal have authorization to copy or retain such computer files.  At no time has Samson or any other employee had authorization to search, download, or view my emails, or the emails of any other active Reliq employee.  There is nothing in Reliq's company policies or agreement that allows Samson to take or retain his or other employees' proprietary and confidential Reliq files, nor is there anything in Reliq's company policies that would allow Samson or any other employee to access active employees' email accounts.

54.     "The theft of Reliq's files by Samson, Deveros and Neal is deeply troubling and clearly has the potential to gravely harm Reliq's business. The files Samson, Deveros and Neal downloaded include but are not limited to client leads; customer pipelines; Reliq Marketing and Sales strategy; product pricing; and product roadmap.  Reliq considers this information proprietary and confidential.  Samson, Deveros and Neal should clearly not be allowed to retain this stolen information after leaving Reliq to operate a competing company.

55.     "Independent forensic examiners have confirmed that Samson erased the contents of the Reliq computer he used prior to returning it to Reliq through a "factory reset."  He was not authorized to delete the contents of his computer, and his deletion of the contents of the MacBook Reliq provided for his use violates the express instructions given to Samson by Reliq's legal counsel two days prior to his deletion/destruction of the evidence.  *See* Exhibit A-5 attached hereto.

56.     "As a result of Samson, Deveros and Neal's unauthorized copying of Reliq files, violations of the privacy and confidentiality of Reliq employees' email and other accounts, and deleting of Reliq files, Reliq has spent more than $30,000 CAD to investigate the extent of Samson, Deveros and Neal's evidence tampering, privacy violations and theft of Reliq's electronic files.

**Boby Deveros Theft of Medical Devices**

57.     "Boby Deveros ("Deveros") is a former contractor that worked for Reliq in Canada and made occasional trips as a Reliq employee to Texas.  Deveros began working for Reliq in May 2018 and was responsible for setting up and managing the Implementation team that would assist Reliq customers with the patient on-boarding process.  Reliq shared confidential information with Deveros with the understanding and expectation that he would comply with his duties of care, loyalty, honesty, full disclosure, and not engage in self-dealing.

58.     "In the December 4, 2018 meeting with Samson and Deveros, Deveros resigned from Reliq along with Samson.

59.     "On December 12, 2018, David Hernandez, the Accuhealth employee who was the former Director of Nursing for Paz, requested that Reliq provide ForaCare D40g medical devices to Accuhealth.  I responded that the next generation of the iUGO Care software would not support these devices, as at the time we still believed (based on Samson's representations) the iUGO software didn't work and we would have to license a different software that could only connect to iHealth devices. Reliq did not provide the requested ForaCare D40g medical devices to Accuhealth and I informed Mr. Hernandez that iUGO would only support iHealth devices going forward.  We have since learned that the iUGO software is fully functional and able to connect to ForaCare and other manufacturer's devices, but at the time we were still under the mistaken impression that Samson and Deveros's were being truthful when they asserted that the iUGO software didn't work.

60.     "The ForaCare devices Accuhealth sought were originally purchased by Reliq in May 2018 for a total of over $4,000,000 CAD. Reliq engaged a third party logistics provider in Minnesota to store and ship these devices.  In November 2018, while an employee of Reliq, Deveros instructed the logistics provider to ship 5,000 devices to a warehouse in Texas  owned by CTC Distributing,

against my explicit instructions. CTC Distributing, acting in good faith on what they believed were the instructions of an authorized representative of Reliq, agreed to store and ship the ForaCare devices per Reliq's standard protocols. Under these protocols, Reliq must approve a customer's order for devices and authorize shipment to the client's site or to a patient's home.

61. "The ForaCare devices were and always have been company property owned by Reliq. Per the protocols that Deveros's Implementation team developed while at Reliq, only authorized Reliq personnel can authorize CTC Distributing to ship the devices to a client site or patient's home. No one outside of Reliq has any ownership of the devices until they are purchased by a client and Reliq has authorized their shipment, nor does anyone outside of Reliq have authorization or access to retrieve these devices. Only Reliq can dictate when the devices leave the warehouse and the shipping destination.

62. "The medical devices described above were made by a company called ForaCare. These are the same ForaCare devices referred to by Samson and Deveros in their sales chatroom messages described in Exhibit A-6 attached hereto.

63. "On December 18, 2018, Deveros went to CTC Distributing, and posing as a Reliq representative, took 30 of Reliq's medical devices. A true and correct copy of the Bill of Lading is attached hereto as Exhibit A-7. In that Bill of Lading, Deveros signs claiming to be a representative of Reliq, the client of CTC Distributing. At that time, Deveros was not a Reliq representative; he had resigned two weeks prior. Deveros misrepresented himself as a Reliq representative, causing CTC to act in good faith and agree to his request to remove 30 devices. Deveros was not entitled to the medical devices, has no ownership in the devices, and was not a Reliq representative at the time. There are no circumstances under which Deveros was authorized to take Reliq's medical devices. The value of the devices Deveros stole is not less than $5,000.00 CAD.

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 19*

**Shelby Neal**

64.     "Shelby Neal ("Neal") was recruited by Samson to join Reliq in May 2018.  Neal was given an employment contract that enumerated the terms and conditions of her employment.  Neal negotiated, through Samson, for a higher salary, bonus, and more paid time off.  Neal accepted the terms and conditions of her employment by reporting to work and acting in accordance with the employment contract.  Reliq paid Neal the agreed upon salary as outlined in her employment contract; paid Neal the $20,000 signing bonus as outlined in her employment contract; and complied with its other obligations in the employment contract.  Reliq understood that the employment contract governed its relationship with Neal.  A true and correct copy of the employment contract is attached hereto as Exhibit A-8.

65.     "Neal was tasked with supervising the implementation of Reliq's software with Reliq's clients.  Reliq shared confidential information with Neal with the understanding and expectation that she would comply with her duties of care, loyalty, honesty, full disclosure, and not engage in self-dealing.

66.     "In her position as Manager of Implementations, Neal reported directly to the Director of Implementations, Boby Deveros.  At all times during Neal's employment, Reliq had the ability to assign Neal specific tasks or projects and require Neal to adhere to Reliq's policies and procedures.  Reliq also provided or reimbursed Neal for benefits generally available to its other employees, such as healthcare (COBRA), vacation, and stock options. Further, Reliq had the authority to terminate Neal's employment or otherwise discipline Neal at its discretion.

67.     "Reliq provided Neal with all the necessary equipment and materials needed to perform her responsibilities as the Manager of Implementation.  For example, Reliq provided Neal with a laptop and access to the Company's systems and technology.  Reliq paid Neal based on an

agreed annual salary.   Neal's position as Manager of Implementations was integral to the Company's operations.   More specifically, Neal was responsible for ensuring that Reliq patients were successfully onboarded onto the iUGO platform, and assisting Reliq clients with software issues.   At all times, it was Reliq's intention to create an employer-employee relationship with Neal and Reliq believed Neal understood she was an employee of Reliq.

68.   "During her employment, Neal never contested her status as an employee of Reliq. Reliq expected Neal to devote her full working time to fulfilling her duties as a Manager of Implementation for the benefit of Reliq.

69.   "To assist Neal in effectively performing her job, Reliq gave Neal access to Reliq's confidential and proprietary information. Neal was provided with confidential and proprietary customer information, including potential customer information.   Neal was provided sensitive and confidential information about Reliq's iUGO software, as well as confidential information regarding Reliq's business and marketing plans.

70.   "Under the terms of her employment contract, Neal agreed not to use Reliq's confidential information outside of her employment with Reliq.   In the employment agreement, Neal also agreed that she would not solicit Reliq customers after termination of her employment with Reliq. Neal's employment contract required that Neal give at least two (2) weeks' notice prior to her leaving Reliq.   This term was important to Reliq because Neal's job required extensive client interaction, and if Neal left without notice, it would prevent Reliq from being able to smoothly transition Neal's responsibilities to another employee.

71.   "Subsequently, I have learned that Shelby Neal began working for Accuhealth on or before she resigned from Reliq on December 4, 2018.

72.   "Neal's resignation violated her employment contract because she failed to give two

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 21*

(2) weeks' notice prior to her leaving.  Reliq was unable to smoothly transition Neal's responsibilities to another employee as a result of Neal's failure to provide the required notice.  As a result, Reliq was temporarily unable to service the clients Neal assisted.  Reliq was forced to incur additional time and manpower to rectify this issue, which caused Reliq to expend not less than $15,000.

73.     "After Neal's resignation, Accuhealth attempted to solicit Criterion, a Reliq customer that was one of Shelby Neal's accounts.  I reasonably believe Shelby Neal was directly involved in this solicitation since Criterion had been assigned to Shelby Neal as a Reliq employee.

74.     "Of equal or perhaps even greater concern, however, is the fact that Neal stole confidential and proprietary Reliq materials from Reliq's Google Drive and other Google products on or after her resignation date.  The independent forensic examiners have documented that Neal downloaded Reliq's files and folders from Reliq's confidential Google drive, and also downloaded a Google Takeout archive before wiping her Reliq laptop and returning it to Reliq.

**Samson's Misrepresentations re: Implementation & Sales**

75.     "On April 2, 2018, Samson informed me, Thindal and De Lio that Sales and Implementations were his "wheelhouse" and he would like to lead these teams.  De Lio assured me and Thindal that Samson had previously run Sales and Implementation teams at PwC and other companies and had been very successful.  We agreed to try having Samson lead Sales and Implementations.  Samson requested written confirmation that he would receive commissions on both Sales and Implementations.

76.     "On April 13, 2018, Samson texted me saying we only had a few hundred patients on the platform.  Shocked, I sent De Lio an irate text and then called him.  De Lio informed me that Samson was either confused or purposefully being misleading because Samson wanted to take over responsibility for Texas from De Lio, and reminded me that we had the list of the 12,000 patients who

had been onboarded to iUGO including all of their identifying information.  De Lio also reminded me that our primary client had an agreement with the RGVHA ACO that gave her access to over 20,000 patients, and forwarded a copy of that agreement to me.  De Lio explained that the issue was that only a few hundred claims had been successfully processed to date because of various issues around the claims submission process and patient pre-screening for eligibility.  De Lio and Samson committed to investigating ways Reliq could help support clients on multiple billing issues either by providing hands on resources or through automation of specific processes.

77.     "On April 23, 2018 Samson asked for authorization to hire a Director of Implementation, Boby Deveros.  Thindal, De Lio and I agreed.  Samson later stated that Deveros would prefer to come on as a contractor instead of an employee, and requested a contract term of 3 years.  I rejected that request and stated that 12 months was the maximum contract length we could offer.

78.     "From April 23, 2018 on and right up until his resignation, Samson purposefully and repeatedly misrepresented to Reliq's Management team that the company was achieving significant customer traction in South Texas and Mexico, leading me to repeatedly assure shareholders in good faith that we would meet our achieve our published guidance of 30,000 patients onboarded by the end of December, 2018.

79.     "Samson's written representations, copies of which can be provided to the Court, included but are not limited to the following:

- April 23, 2018: Samson texted me that they were about to start onboarding the Rio Grande Valley Health Alliance ACO.

- May 16, 2018: "We had a big day today…I got an intro to an 83 billion dollar hospital chain…We are very busy down here…Implementations are going…Rio grande starts Tuesday…"

- May 17, 2018: 'It's time to put our money where our mouth is. Here's the order for 26,500

devices…I know the number is big, but confident we are going to roll them out and make some cash."

- May 23, 2018: "Closed another deal…New home care agency, her husband is the chairman of an aco here…"

  - I then asked if that means there are new contracts, Samson states: "We are 4/4 now"

- May 23, 2018: "Lisa, we are going to blow up South Texas…Literally everyone we talk to, this is a no brainer…money is going to start coming in and it isn't going to stop…"

- May 31, 2018: Samson texts me and Thindal that he talked to his team and "The entire team feels that commissions should be paid out as soon as a patient is implmented and onboarded and not wait 30 days for us to receive the money. I agree with it as we need to get money into our peoples hands to reward them for all the work they are doing." I responded via text that this was an unusual and off-putting request. A true and correct copy of this communication is attached hereto as <u>"Exhibit A-12."</u>

- June 5, 2018: "July 8th we go live with RGVA [Rio Grande] for [telemedicine]...I have 60 devices going out the door today…"

- June 19, 2018: "I'm working hard down here Lisa, you are going to see a lot of success soon I promise you…"

- July 23, 2018: "Hey some good news.  We have three new instances spinning up this week…and we are go…"

- August 15, 2018: "Between Roxanne and Liza we should be able to hit some serious numbers…I met the CEO of RVA yesterday…"

- August 21, 2018: "We are really moving the needle here for Reliq…"

- September 27, 2018: "We are working out Mexico pipeline. It's way more profitable than the valley.  I had four other meetings this week and meetings set for next.  We are getting a 50k pilot in the new year.....I said to them 50mil a month and they didn't flinch…"

- September 27, 2018: "Yes, they said 7mil patients and asked what the price point was and we said we will have to calculate it but probably in the 50mil a month range usd….Our solution has been presented to the new president in Mexico and he wants to meet…think about that."

  November 2, 2018: "I just got off the phone with my team and we have a very real opportunity to land Rio grande hospital. But I need to invest some cash into it…I estimate this to be $50k max over a couple months. These guy said we'd have to order more d40gs because 27500 isn't enough."

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 24*

80. "Throughout the summer of 2018, Reliq employees De Lio, Drew and Barker implemented a manual process to accelerate on-boarding and billing. Samson fought that process every step of the way. In particular, Samson ultimately went in to the Texas office where the manual data entry for eligibility screening and care plan generation was being performed and removed the computers with the patient lists (there were 15,000 patients whose data was on the laptops, waiting to be screened for eligibility), wiped them and shredded over 300 care plans that were about to be sent to physicians for sign off. This was despite my explicit instructions and Samson's promise to return everything to Paz untouched.

81. "In addition, Samson and Deveros refused to fulfill Paz's orders for ForaCare devices, contrary to instructions from myself and Thindal. Without these devices, Paz could not onboard patients and bill for telemonitoring services, and therefore could not pay Reliq.

82. "As a result of Samson's misrepresentations of the sales for Reliq, together with his and Deveros's active efforts to sabotage patient onboarding and eligibility, in October 2018 Reliq was forced to record previously announced revenue as bad debt and inform shareholders that the company would not come anywhere near previously published guidance for 2018.

83. "On October 22, 2018, less than a week after the company suffered dramatic losses in market cap due to the revenue restatement announced on October 16, 2018, Samson texted me and Thindal that his team was not happy that Reliq had not agreed to pay them the over $1 Million USD in upfront bonuses and raises that Samson requested in the plan he presented to me and Thindal on October 5, 2018. A true and correct copy of the text exchange is attached hereto as Exhibit "A-13." In retrospect this was one of many indicators that Samson and the other Defendants were focused solely on their own gain and had no sense of their fiduciary duties or moral responsibilities to Reliq and its shareholders, many of whom had just suffered devastating losses as a result of Reliq's

announcement on October 16, 2018 that it would need to restate revenues for Q3 FY2018.

84.    "Almost three months **after** he resigned from Reliq, Samson made allegations that in April 2018, Reliq had less than 250 patients.  Yet in an email on May 17, 2018, and text on May 21, 2018, Samson strongly urged Reliq's Management team to approve the purchase of 26,500 ForaCare devices and associated perishable consumables, to be provided to patients as they were on-boarded onto the iUGO platform.  A true and correct copy of this communications is attached hereto as Exhibit "A-14."  At the time, Samson said that the medical devices would be deployed quickly and Reliq would need even more than 26,500 devices before the end of the year.  The 26,500 devices and consumables Reliq purchased cost over $4 million (CAN).   It defies all logic to suggest that Reliq's Management team and Board of Directors would have agreed to make an investment that significant in hardware and **perishable** consumables unless we all, including Samson, were 100% confident in the patient numbers we had already, and in our ability to achieve or exceed our 2018 year end guidance of 30,000 patients on-boarded.

**Losses caused by Defendants**

85.    "Since the summer of 2018, Stephen Samson and Boby Deveros, acting in concert with other Defendants, sabotaged Reliq's screening and onboarding processes, failed to make client-requested updates to the iUGO software, failed to ship client-ordered devices, harassed and intimidated Reliq's largest client at the time and failed to deliver the sales Samson repeatedly assured Reliq were imminent.  This has cost Reliq significant revenue.  We are still in the process of quantifying the loss caused by Samson, Deveros and the other Defendants, but we reasonably believe the actual cost to date to be well in excess of $100,000 (one hundred thousand dollars).   Since December 4, 2018, at least one of Paz Home Health's physician clients has moved their patients from Paz to Accuhealth.  These patients have the potential to be worth millions of dollars to Paz and Reliq

over the next few years.

**Reliq's purpose in filing suit**

86.    "The suggestion that Reliq filed this lawsuit because we wanted to stop Samson and Deveros from reporting anything to any regulatory or governmental agency is nonsensical.  In my December 4, 2018 meeting with Samson and Deveros, Samson stated that he had a meeting scheduled the next day, December 5, 2018, with regulators. We had no information then and have none now to suggest that he did not attend that meeting.  Reliq did not file this lawsuit for at least a month after my last conversation with Samson and Deveros on December 4, 2018, and it should particularly be noted that we did not file this lawsuit until after we received a demand letter from the Defendants on January 3, 2019 asking for payment under the terms of the Evelyn contract, which they and we knew had been procured by fraud.

87.    "On January 3, 2019, Reliq received a demand letter from legal counsel for Accuhealth and Evelyn Canada, making demand for hundreds of thousands of dollars, alleging breach of contract for non-payment.  *See* Exhibit A-9 attached hereto.  Given Samson, Deveros and others' fraudulent conduct that Reliq uncovered after their resignations from Reliq, the only motivation for Reliq's lawsuit was and is to hold Samson, Deveros and the other Defendants accountable for their malfeasance.

88.    "This lawsuit was filed only because the actions of Samson, Deveros, Neal and the other Defendants in this lawsuit have caused significant harm to Reliq and to Reliq's shareholders. After Samson, Deveros and Neal resigned from Reliq on December 4, 2018, and after Reliq was able to regain control of its IT systems and network, Reliq discovered that Samson, Deveros and others had engaged in a calculated conspiracy to defraud Reliq and its shareholders out of millions of dollars.

I do declare under penalty of perjury that the foregoing is true and correct."

*Declaration of Lisa Crossley, CEO of Reliq Health Technologies, Inc. - 27*

Executed on March <u>18</u>, 2019.

Lisa Crossley, Ph.D.
Chief Executive Officer
Reliq Health Technologies, Inc.